UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

No. 00-6129
(CA-95-271-WMN)

Quinten X. Jackson,

Plaintiff - Appellee,

versus

Lamont A. Morgan, etc., et al.,

Defendants - Appellants.

O R D E R

The court amends its opinion filed September 24, 2001, as follows:

On page 2, section 1 -- the section is corrected to begin: "Reversed and remanded by unpublished opinion. Judge Duffy wrote the opinion, in which Chief Judge Wilkinson joined. . . ."

On page 2 -- the opinion is corrected to begin "DUFFY, District Judge."

For the Court - By Direction

/s/ Patricia S. Connor
Clerk

UNPUBLISHED

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

QUINTEN X. JACKSON,
Plaintiff-Appellee,

v.

LAMONT A. MORGAN, Correctional
Officer; STANLEY LOCKLEAR,
Lieutenant; GREGORY MADDOX,
Sergeant; KEVEN FENTON, Corporal;
ROBERT HICKS; MAARUFU AULU; ERIK

NELSON,
Defendants-Appellants,

and

STEVEN HARLEE; HOWARD GRANT;
RICHARD LANHAM; EUGENE NUTH; T.
CARTER, Sergeant; R. PARKER,
Corporal,
Defendants.

No. 00-6129

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Paul W. Grimm, Magistrate Judge.
(CA-95-271-WMN)

Argued: April 5, 2001

Decided: September 24, 2001

Before WILKINSON, Chief Judge, MOTZ, Circuit Judge,
and Patrick Michael DUFFY, United States District Judge
for the District of South Carolina, sitting by designation.

_____

Reversed and remanded by unpublished opinion. Judge Duffy wrote the opinion, in which Chief Judge Wilkinson joined. Judge Motz wrote a dissenting opinion.

_____

## COUNSEL

**ARGUED:** Glenn William Bell, Assistant Attorney General, Baltimore, Maryland, for Appellants. Brian Alain Zemil, VENABLE, BAETJER & HOWARD, L.L.P., Towson, Maryland, for Appellee. **ON BRIEF:** J. Joseph Curran, Jr., Attorney General of Maryland, Baltimore, Maryland, for Appellants. Mitchell Y. Mirviss, VENABLE, BAETJER & HOWARD, L.L.P., Towson, Maryland; Theodore F. Roberts, DANAHER, TEDFORD, LAGNESE & NEAL, P.C., for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

## OPINION

DUFFY, District Judge:

Appellants Locklear, Maddox, Fenton, Hicks, Aulu, Morgan, and Nelson appeal from a jury verdict in the amount of $1 actual damages and a total award of $9,500 punitive damages. Appellants argue, inter alia, the district court erred in denying their motion for judgment as a matter of law. For the reasons set forth below, we reverse.

I.

Jackson brought claims under 42 U.S.C. § 1983 against Appellants for excessive force violating his Eighth Amendment rights. Appellants worked at the Maryland Correctional Adjustment Center, where Jackson was incarcerated during the relevant times in this case. Appellants were the response team sent to Jackson's cell by the duty officer who had already decided to remove Jackson from his cell for

2

an earlier disturbance and to place him in the isolation cell. Jackson alleged Appellants used excessive force January 11-13, 1994, in two instances: (1) Appellants' use of pepper spray inside Jackson's cell, and (2) Appellants' placement of Jackson into an isolation cell known as "the pink room" for two days wearing only underwear and in three-point mechanical restraints and after spraying him with pepper spray.

On January 11, 1994, Lieutenant Locklear responded to Jackson's cell as the Duty Lieutenant in charge of all housing on that particular shift. The shift commander had ordered Jackson removed from his cell and placed in an isolation cell because he had been causing a disturbance. Lieutenant Locklear attempted to carry out that order with authorization to use pepper spray if necessary.

Jackson refused to comply with removal procedures and the orders of Lieutenant Locklear. Pursuant to regulations, Lieutenant Locklear ordered Jackson to remove and deliver his clothing for inspection prior to opening Jackson's cell. Also according to regulations, Appellants then began to videotape their actions. Jackson still failed to comply, and Lieutenant Locklear sprayed pepper gas into Jackson's cell. The pepper spray hit Jackson in his face and groin. After twelve bursts of pepper spray at three different times and after repeated orders to comply, Jackson complied with removal procedures.

After removal, Jackson was taken to the medical department for treatment. The registered nurse on duty washed his head under running water and allowed him to wipe his groin with wet paper towels. Jackson was in three-point restraints during his flushing of the pepper spray. The response team then escorted Jackson to the isolation cell. Jackson was provided clean underwear and left in three-point mechanical restraints.

The district court allowed two of Jackson's claims to be submitted to the jury. Those two claims were for the amount of pepper spray used by Lieutenant Locklear and for Jackson's placement in the isolation cell for two days. The district court gave the jury a verdict form containing eleven pages of special interrogatories to assist its determination. The jury returned a verdict for Appellants on Jackson's claim for the use of pepper spray on January 11, 1994, but the jury found against Appellants for Jackson's claim of excessive force for his stay

3

in the isolation cell. The jury also found Jackson proved by a preponderance of the evidence, but not by clear and convincing evidence, Appellants acted with malice. The jury then awarded $1 actual damages and punitive damages against specific Appellants totaling $9,500. The district court denied Appellants' motion for judgment as a matter of law in a post-trial order.

II.

We review de novo a district court's legal determinations under a Rule 50(b) motion for judgment and determine questions of the sufficiency of the evidence on whether a reasonable jury, based upon the evidence presented, could have reached their verdict. Trimed, Inc. v. Sherwood Medical Co., 977 F.2d 885, 888 (4th Cir. 1992). The evidence is viewed in the light most favorable to the party against whom the motion is made, and that party given the benefit of all reasonable inferences. We will not reweigh the evidence or judge credibility. GSM Dealer Servs. Inc. v. Chrysler Corp., 32 F.3d 139, 142 (4th Cir. 1994).

Appellants argue the district court erred in denying their motion for judgment as a matter of law because Jackson failed to establish the objective and subjective requirements of an excessive force claim. Specifically, Appellants argue that Jackson failed to establish they "acted with a sufficiently culpable state of mind and the deprivation suffered was not sufficiently serious." We agree.

The Eighth Amendment expressly prohibits the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII. "It not only outlaws excessive sentences but also protects inmates from inhumane treatment and conditions while imprisoned." Williams v. Benjamin, 77 F.3d 756, 761 (4th Cir. 1996); see Wilson v. Seiter, 501 U.S. 294, 298 (1991); Estelle v. Gamble, 429 U.S. 97, 104 (1976). To succeed on any Eighth Amendment claim for cruel and unusual punishment, a prisoner must prove: (1) objectively the deprivation of a basic human need was sufficiently serious, and (2) subjectively the prison officials acted with a "sufficiently culpable state of mind." Wilson, 501 U.S. at 298; Williams, 77 F.3d at 761.

We are mindful that prison officials should be allowed latitude in taking preventive measures to maintain safety of the officers and

4

medical workers. The Supreme Court has clearly recognized the danger of overstepping the boundaries of judicial review in this area:

> "Prison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." That deference extends to a prison security measure taken in response to an actual confrontation with riotous inmates, just as it does to prophylactic or preventive measures intended to reduce the incidence of these or any other breaches of prison discipline. It does not insulate from review actions taken in bad faith and for no legitimate purpose, but it requires that neither judge nor jury freely substitute their judgment for that of officials who have made a considered choice.

Whitley v. Albers, 475 U.S. 312, 321-22 (1986) (quoting Bell v. Wolfish, 441 U.S. 520, 547 (1979)).

III.

The objective element of an excessive force claim requires more than a de minimis use of force. The Supreme Court has proscribed recovery based on de minimis force, unless that use of force is "repugnant to the conscience of mankind." Hudson v. McMillian, 503 U.S. 1, 9-10 (1992) (internal quotation marks omitted). De minimis injury is evidence of de minimis force. Norman v. Taylor, 25 F.3d 1259, 1262-63 (4th Cir. 1994). This Court en banc has recognized a bright-line rule in the Supreme Court's jurisprudence that de minimis injury defeats a plaintiff's excessive force claim "absent the most extraordinary circumstances," i.e., unless the force used was "repugnant to the conscience of mankind." Id. at 1263.

In Norman the district court granted summary judgment against the plaintiff. Although this case presents a different procedural posture, we must also look at the facts in the light most favorable to the plaintiff and make all reasonable inferences in his favor. Given the firmly established law in Norman, we believe no reasonable jury could have found for Jackson.

5

The district court's order denying Appellants' motion for judgment as a matter of law gave several justifications for the decision. The district court relied on testimony about the pain and disability caused by the pepper spray from Jackson. The district court found the medical treatment to relieve the effects of the pepper spray was insufficient given the amount of pepper spray used and the length of his confinement in the isolation room.[1] The district court also found that Jackson's claim was supported by evidence that the force used by appellants was "repugnant to mankind" and therefore satisfied Jackson's burden of proof even if his injury was de minimis. However, the court pointed only to the jury's "statement regarding their feelings about the Defendants' conduct."

The jury added to the verdict form two handwritten pages admonishing Appellants and Maryland Department of Corrections for conditions of the isolation room and urging punishment for Appellant Fenton who they thought had struck Jackson without provocation during the transfer of Jackson from his cell to the isolation cell.[2] Most of the jury's statement was directed at the conditions in the isolation cell. We recognize that this court has condemned cell conditions simi-

—————————————————————————————————————

[1] Despite the alleged pain and disability, two minutes after exiting his cell--at 2:05 p.m. on the video tape--Jackson was shouting in Officer Fenton's face, calling him a devil, and "speaking in tongues." By 2:10 p.m. on the video tape, Jackson had washed his face and head eight times; the nurse had cleaned his head three times; and he exhibited no effects of the pepper spray. In fact, Jackson limited his decontamination and can be heard on the video tape telling the nurse, "That's alright." Jackson was then provided wet paper towels with which to wash his groin, and he cleaned his groin several times.

[2] This apparent act by Officer Fenton has been described as a blow. A blow is a sudden hard hit, as with a fist; an unexpected shock. The tape does not disclose any blow. During Jackson's transfer to the medical department, Officer Fenton can be seen making a gesture or swipe in the air when Jackson was turned around toward Officer Fenton and chanting in his face. No contact can be seen on the video tape. If there was any contact at all, then Jackson did not so much as blink. He did not flinch, recoil, react, or cry out. Jackson continued unabated shouting over his shoulder in Officer Fenton's face. Forceful contact, if any, must be assumed from the video tape. In any event, any possible injury to Jackson was de minimis.

lar, though admittedly more severe, than those of the isolation cell used in this case. See Kirby v. Blackledge, 530 F.2d 583, 586-87 (4th Cir. 1976) (identifying conditions that "taken alone reach the level of cruel and unusual punishment" and describing a strip cell that has "no bedding, no light, and no toilet, save a hole in the floor"). The jury in this case came to the same conclusion about the conditions of the isolation cell, but their comments were gratuitous.

This appeal involves a claim for excessive force and facts, such as the use of pepper spray and placement in an isolation cell in three-point restraints, that are not being reviewed for the first time. Taking the evidence in the light most favorable to Jackson, no reasonable jury could find the force used in this case was "repugnant to the con-science of mankind." Therefore, the propriety of sending this case to the jury depends on a showing of sufficient evidence for a reasonable jury to find Jackson suffered more than de minimis injury. See Norman v. Taylor, 25 F.2d at 1263.

The jury's verdict included $1 actual damages which could be con-strued as a finding of de minimis injury to Jackson. However, the jury instructions, provided upon request of the Court after oral arguments, reveal the jury was instructed: "If you find that the plaintiff is entitled to a verdict in accordance with these instructions, but do not find that the plaintiff has suffered substantial actual damages, then you may return a verdict for the plaintiff in some nominal sum such as one dol-lar." (J.I. 30, emphasis added.) The instructions also provided: "You may not, however, compensate a plaintiff who has not suffered any actual pain or injury which is more than de minimis as a result of the unconstitutional conduct." (J.I. 26, emphasis added.) We recognize the jury's verdict of $1 actual damages reflects their view that Jack-son suffered more than de minimis injury but less than substantial injury. However, in reviewing a district court's denial of a motion for judgment as a matter of law, we do not defer to the jury's verdict. Rather, we must review the district court's decision on the motion.

The district court erred in relying on this court's decision in Wil-liams to support the denial of Appellants' motion for judgment as a matter of law. Williams does not control disposition of this case. Sev-eral material facts distinguish this case and warrant reversal. First, Williams discussed only the subjective element of the excessive force

7

claim and did not address the objective element because the officers conceded Williams had met his burden on that issue. Second, the chemical spray in Williams was CS tear gas, the type used by military and discontinued prior to 1994 by Maryland Department of Corrections. See Williams, 77 F.3d at 764 (recognizing CS tear gas as potentially lethal). Appellants used OC pepper spray on Jackson. The experts in this case testified to the differences between CS tear gas and OC pepper spray, not the least of which was the timing and appropriateness of using the two different sprays as a use of force. Pepper spray is a milder irritant and is employed to avoid physical confrontation among inmates and guards; whereas CS tear gas was used primarily as a weapon with greater consequences and required more thorough decontamination.

Third, the greater effects and severity of damage caused by CS tear gas than by OC pepper spray directly affects the necessary medical treatment after exposure and prior to being placed in isolation. Appellants' expert in this case testified that the effects of OC pepper spray did not last more than an hour and had no known permanent effects. Williams received no medical treatment following the use of the more potent CS tear gas against him. Jackson's treatment and decontamination was documented on the videotape and included flushing his face and head with running water and wiping his groin with wet paper towels. Jackson's decontamination was adequate, and Jackson did not complain to the nurse or the officers.

The notes of the registered nurse who treated Jackson on January 11, 1994, showed Jackson had no complaints that day. In addition, the videotape showed Jackson's recovery from the effects of the pepper spray. Jackson submitted no medical testimony that the OC pepper spray had any lasting effect or aggravated an existing condition. Jackson's own testimony revealed his allegations were not supported by any complaints to the medical department. Jackson made no complaints of any kind until January 27, more than two weeks after he was sprayed with pepper spray, and even then none of his complaints referenced the January 11-13, 1994, incident.

Fourth, the type of restraints and effect on the inmate in those restraints was substantially more severe in Williams even though Williams stayed in the restraints only eight hours. The four-point

8

mechanical restraints prevented Williams from eating and required him to urinate on himself. Jackson argues his three-point restraints were too tight and caused him constant pain during the time he was in the isolation cell. Jackson also claims the restraints prevented him from eating and properly urinating in the isolation cell.

The three-point restraints did not totally prevent either activity for Jackson though his movement was restricted. The videotape showed Jackson used his hands to wipe his face and groin area wearing the same restraints in which he was placed in the isolation cell. The record of isolation confinement shows all meals were at least offered to Jackson during confinement in the isolation cell and that Jackson refused breakfast and lunch on January 12, 1994. Jackson's testimony does not dispute this. Jackson made no complaints of these allegations even though he knew how to make complaints and had done so before, and the record of confinement reveals no complaints or discussion with Jackson while he was in the isolation cell.

Jackson has not shown more than de minimis injury. Taking the evidence in the light most favorable to Jackson and making all reasonable inferences in his favor, we believe no reasonable jury could find excessive force was used. Therefore, the district court should have granted Appellants' motion for judgment as a matter of law, and we reverse.

IV.

Because this Court reverses the district court's ruling on Appellants' motion for judgment, we do not reach the questions presented on the subjective element of an excessive force claim, qualified immunity, and punitive damages.

CONCLUSION

For the reasons stated herein, we reverse Jackson's jury verdict against Appellants and remand to the district court with direction to enter judgment for the Appellants in accordance with Rule 50(b) of the Federal Rules of Civil Procedure and this opinion. See Mutual Life Ins. Co. of N.Y. v. Asbell, 163 F.2d 121, 123 (4th Cir. 1947).

REVERSED AND REMANDED

9

DIANA GRIBBON MOTZ, Circuit Judge, dissenting:

The Eighth Amendment outlaws the unnecessary infliction of pain, even on convicted felons. Quentin Jackson presented ample evidence from which the jury could conclude, as it did, that correctional officers maliciously and sadistically used excessive force to inflict unnecessary and wanton pain on him, in clear violation of the Eighth Amendment. The jury's award to Jackson of one dollar in actual damages and $9,500 in punitive damages is a measured and entirely appropriate response to the evidence presented at trial. Accordingly, I would affirm the jury verdict and must respectfully dissent from the majority's refusal to do so.

I.

The facts giving rise to this lawsuit occurred on January 11, 1994, during a routine "shakedown," (body and cell search) at the Maryland Correctional Adjustment Center (MCAC). At trial, the parties offered conflicting testimony as to what transpired during this search. In light of the jury verdict in favor of Jackson, we are required to view the facts in the light most favorable to him. See Fed. R. Civ. P. 50(a). Nevertheless, in order to set forth all of the legal issues involved, I also include the officers' version of the facts.

Jackson testified that, while he was unclothed, Officer Morgan ordered him to turn in circles repeatedly, not just once or twice as is normal in a shakedown. Jackson objected to this perceived harassment, calling Officer Morgan a homosexual. Jackson stated that, despite this harassment, he permitted the officers to continue the search, and then, when they were finished, he asked to see the officers' superior so that he could voice his concerns and obtain the appropriate form to make a written complaint to the Warden. A few minutes later, according to Jackson's testimony, instead of the officers' superior, a Response Team arrived wearing riot gear and gas masks to extract Jackson from his cell.

The officers testified, to the contrary, that Jackson refused to leave his cell during the shakedown, thereby preventing them from searching it. Although the officers acknowledged that they ultimately persuaded Jackson to vacate his cell so that it could be searched, they

10

maintained that Jackson created a disturbance in the cell block by yelling obscenities and banging on the walls. According to the officers, when they informed Jackson that he would be placed in an isolation cell for creating a disturbance, he refused to comply with the ordinary removal procedures. For this reason, they assembled a six-person Response Team to transport Jackson to the isolation cell known as the Pink Room to "cool down."

Jackson maintains that he created no disturbance necessitating removal from his cell to "cool down." When the Response Team arrived at his cell, Jackson testified that he was sitting quietly on his bunk reading. Jackson's account, rather than the officers' was apparently credited at a subsequent prison disciplinary hearing, in which Jackson was found not guilty of creating a cell block disturbance.

Many of the remaining relevant facts are clearly documented in the Response Team's videotape, which begins with the Team's arrival at Jackson's cell. The tape starts at 1:54 p.m. with an introduction and identification of the Response Team. The tape shows only the outside of Jackson's cell, from which point Jackson cannot be seen, but no disturbance can be heard.

The videotape reveals that, at 1:56 p.m., Officer Locklear orders Jackson to pass his clothes out and to place his hands in the feed slot to be cuffed. Jackson responds by stating that he had just been searched, and asks the purpose of the officers' request. Locklear then sprays two bursts of pepper spray into Jackson's cell.[1] Jackson testified, without contradiction, that the first burst of pepper spray struck him in the groin, causing a painful burning sensation, and the second

_____

[1] Jackson introduced the following uncontroverted evidence as to the pepper spray the officers used against him. The spray consisted of ninety percent Freon-based chemical, which acted as a propellant, and ten percent Oleo Resin Capsicum, which is derived from the hot oil and waxes of the cayenne pepper. This chemical takes effect upon contact with skin and mucous membranes and causes a painful, burning sensation, inflammation of the mucous membranes in the eyes, nose and throat, skin inflammation, coughing or gagging if inhaled and an involuntary closing of the eyes. The physical effects of the spray are accompanied by psychological effects, including fear, disorientation, anxiety and panic.

11

burst struck him in the face, causing him to cry out in pain. Jackson stated that he felt like his body was burning and he began to choke and gag from inhalation of the pepper spray. His eyes swelled shut and he was unable to breathe. Due to the pain he was experiencing, Jackson maintains that he became confused and disoriented, and was unable to understand the orders the Response Team directed to him.

At 1:58 p.m., two minutes after the first bursts of pepper spray, Jackson has still not complied with the Response Team's orders; Locklear sprays four additional bursts of pepper spray into Jackson's cell. At 1:59 p.m., Jackson passes his jumpsuit through the feed slot to the officers. Locklear then orders Jackson to send out the rest of his clothes as well. At 2:00 p.m., Locklear sprays an additional burst of pepper spray, this one lasting a full six seconds. The videotape reveals that this burst of pepper spray causes Jackson to cough and gag. At 2:01 p.m., Jackson passes his underwear and shoes through the feed slot. Nevertheless, at 2:02 p.m., the administration of five additional bursts of pepper spray can be heard. At trial, Officer Maddox acknowledged that, at that point, he had gone around to the back of Jackson's cell and sprayed into Jackson's cell through the window, which was covered by a mesh screen.

At 2:03 p.m., Jackson places his hands in the feed slot to be hand-cuffed, and exits his cell wearing a jumpsuit. The tape reveals that Jackson is in obvious pain; he gasps for air and rubs his teary eyes. At 2:04 p.m., the Response Team leads Jackson to the infirmary. Jackson has difficulty walking and, at one point, falls down. At 2:05 p.m., while walking to the infirmary, Jackson begins babbling incoherently. (Jackson testified that at this time he was "speaking in tongues" and praying to God.) At 2:06 p.m., shortly after going through a doorway, Jackson testified that Officer Fenton struck him in the back of the head. Although Officer Fenton denied striking Jackson, the blow can be seen on the videotape.

At 2:07 p.m., the officers take Jackson to the nurse. The officers permit him to rinse his head in a sink for several minutes and to rub his genitals with a wet paper towel. In addition, the nurse rubs Jackson's face with a paper towel. This is the only medical treatment that the officers provided Jackson before confining him to the Pink Room isolation cell.

12

From 2:12 p.m. to 2:19 p.m., the Response Team prepares Jackson for placement in the Pink Room. During this period the Team removes Jackson's shackles and orders Jackson to remove his jump-suit and underwear. After several minutes, during which time Jackson is naked, the officers provide him with clean underpants, but nothing else. The officers then re-shackle Jackson and place him in the isola-tion cell, clothed only in his underwear. The videotape record of the entire preparation period shows Jackson remaining calm throughout. Department of Corrections (DOC) regulations state that prison offi-cials can place in-cell shackles on an inmate only when he presents a serious threat of violence.

Although it is no longer in use, at the time of this incident, the Pink Room was a bare cell approximately ten feet by ten feet with metal walls, a concrete floor and no furniture. It lacked a toilet, and instead had a hole in the floor, covered by a grate, which, during Jackson's confinement, was encrusted with feces and blood.

Jackson testified that the shackles placed on him throughout his confinement in the Pink Room were so tight that he could not move his hands, and so he could not even remove his underwear to urinate. Although it was very cold in the Pink Room and Jackson was clad only in underwear, the officers provided him with no bedding or clothes. In addition to the cold and the painful shackles, Jackson testi-fied that he was in continual pain due to the effects of the pepper spray during the entire period of his confinement in the Pink Room.

According to the logs of Jackson's confinement, although he was awake and alert, the officers did not provide him with any food for sixteen hours. When he was finally provided with food, during the seventeenth hour of his confinement, Jackson testified that the shack-les prevented him from eating. The logs record that Jackson remained calm for the first seventeen hours he was imprisoned in the Pink Room. Nevertheless, his confinement there continued for nearly forty-five hours.

Captain Jeffrey Wells, a DOC employee, testified at trial as an expert witness for the officers. Wells stated his opinion that this case presented a need to use force and to remove Jackson from his cell. He also opined that the use of twelve bursts of pepper spray was an

13

appropriate amount of force. He agreed that in-cell restraints should never be used as a form of punishment but only as a "management tool" to control an inmate while the inmate was in an isolation cell.

Vincent Nathan, a lawyer specializing in prison law, testified as an expert for Jackson. Nathan noted that Jackson was not creating a disturbance or threatening anyone at the time the Response Team forcibly extracted him from his cell, and so there was no need to relocate him. Nathan also noted that the correctional officers made no attempt to use non-forceful means to resolve the situation. Nathan further testified that the prison officials did not sufficiently decontaminate Jackson from the pepper spray. All of the exposed areas of Jackson's body should have been flushed with water and washed with soap after the incident. (Although the prison's protocol also required that all exposed areas of an inmate's body be flushed with water, the officers only permitted Jackson to rinse his head and genitals with water for a short time.) Given these facts, Nathan opined that the Pink Room confinement of Jackson constituted a grossly excessive use of force.

II.

In March 1995, Jackson initiated this action, alleging that the MCAC officers' use of excessive force on January 11-13, 1994, violated his Eighth Amendment right to be free from cruel and unusual punishment. With the parties' consent, Magistrate Judge Paul W. Grimm presided over a jury trial on Jackson's claims. The jury found for the correctional officers on Jackson's claim that use of the pepper spray in itself constituted excessive force, but found for Jackson on his claim that the officers used excessive force in confining him in three-point restraints in the manner they did for almost two days.[2] The jury awarded Jackson one dollar in compensatory damages and $9,500 in punitive damages.

_____

[2] Jackson also alleged that he was placed in an isolation cell without due process of law. Judge Grimm granted the officers' motion for judgment as a matter of law on Jackson's Fourteenth Amendment due process claim on qualified immunity grounds, concluding that there was no clearly established constitutional right to a pre-deprivation hearing prior to placement of an inmate in the isolation cell. Jackson does not appeal that ruling.

14

The jurors also requested that the following statement be read into the record:

> We find that the conditions existing at the Maryland Correctional Adjustment Center, in particular, the isolation cell known as the "pink room" violate the eighth amendment rights of prison occupants. Specifically we regard the conditions inflicted upon the prisoners of "a sort repugnant to the conscience of mankind.". . . We urge the cessation of the use of the "pink room" while its conditions violate the eighth amendment.

Judge Grimm denied the officers' post-trial motion for judgment as a matter of law, and the officers appealed to this court.

As the majority recognizes, although we review de novo a district court's legal determinations, a jury's factual finding must be affirmed unless there is "no legally sufficient evidentiary basis for a reasonable jury" to so find. Fed. R. Civ. P. 50(b). Indeed, reviewing courts "owe great deference to the jury's view of the evidence." Newman v. Holmes, 122 F.3d 650, 653 (8th Cir. 1997) (affirming jury verdict for prisoner where question of whether guard was deliberately indifferent was "very close"). Moreover, we, as an appellate court, cannot reweigh the evidence or judge credibility, but rather must view the evidence in the light most favorable to Jackson as the prevailing party.

III.

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII. Undeniably, the "unnecessary and wanton infliction of pain," constitutes cruel and unusual punishment forbidden by the Eighth Amendment. Hudson v. McMillian, 503 U.S. 1, 5 (1992); Whitley v. Albers, 475 U.S. 312, 319 (1986); Ingraham v. Wright, 430 U.S. 651, 670 (1977).

To determine whether a prison official has violated the Eighth Amendment, courts must analyze both subjective and objective components. See Wilson v. Seiter, 501 U.S. 294, 298 (1991). Specifically, this analysis requires "inquiry as to whether the prison official acted

15

with a sufficiently culpable state of mind (subjective component) and whether the deprivation suffered or injury inflicted on the inmate was sufficiently serious (objective component)." Williams v. Benjamin, 77 F.3d 756, 761 (4th Cir. 1996). "What is necessary to establish an unnecessary and wanton infliction of pain" with regard to each component "varies according to the nature of the alleged constitutional violation." Hudson, 503 U.S. at 5 (internal quotation marks omitted).

In an excessive force case, a claimant must meet a heavy burden to satisfy the subjective component of the claim; specifically, he must prove that correctional officers applied force "maliciously and sadistically for the very purpose of causing harm." Whitley, 475 U.S. at 320-21. The objective component of an excessive force claim is not nearly as demanding, however, because "[w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated. This is true whether or not significant injury is evident." Hudson, 503 U.S. at 9. With these principles in mind, I turn to the facts of this case.

IV.

The majority rests its decision to reverse the jury verdict solely on the ground that Jackson failed to offer sufficient evidence to satisfy the objective component of his excessive force claim. Accordingly, I begin with an analysis of that component.

To establish the objective component of an excessive force claim, generally a plaintiff must simply prove that he suffered more than de minimis injury. Id. at 9-10. However, if "a particular application of force . . . cause[s] relatively little, or perhaps no, enduring injury, but nonetheless . . . result[s] in an impermissible infliction of pain," the pain itself "will be such that it can properly be said to constitute more than de minimis injury." Norman v. Taylor, 25 F.3d 1259, 1263 n.4 (4th Cir. 1994). Moreover, when the amount of force used is "of a sort repugnant to the conscience of mankind," the plaintiff need not show even de minimis injury to satisfy the objective component. Id. In such a case, even if the plaintiff suffered no lasting injury, he can prevail on the objective component of an excessive force claim. Jackson offered the following evidence in support of the objective component of his claim:

16

- The officers sprayed his cell with pepper spray twelve times.

- Pepper spray causes pain, burning, inflammation of the mucous
    membranes in the eyes, nose and throat, skin inflammation,
    induces coughing or gagging and causes the eyes to close involun-
    tarily. The spray also produces psychological effects, such as fear,
    disorientation, anxiety and panic.

- Jackson did not receive any medical treatment after being exposed
    to the pepper spray. Satisfactory decontamination from the effects
    of pepper spray requires one to flush all affected areas with water
    and wash them with soap. The officers' only attempt at decontami-
    nation was limited to giving Jackson a few minutes to rinse his
    face and groin area with water.

- After removing him from his cell, the officers locked Jackson in
    an isolation cell, known as the Pink Room, for forty-four hours.

- The Pink Room was a bare cell approximately ten feet by ten feet
    with metal walls, a concrete floor and no furniture. It lacked a toi-
    let, and instead had a grate in the floor encrusted with feces and
    blood.

- Although it was January, Jackson was not provided with any bed-
    ding, clothing -- save a single pair of underpants -- or other
    means of staying warm.

- The officers withheld food from Jackson for sixteen hours.

- During his confinement, Jackson was forced to wear excessively
    tight three-point restraints which caused him pain when he moved
    and prevented him from eating and removing his clothes to uri-
    nate.

After receipt of this evidence, Judge Grimm instructed the jury that
it could award nominal damages, such as one dollar, but only if it
found "that the plaintiff is entitled to a verdict in accordance with
these instructions, but [did] not find that the plaintiff has suffered sub-
stantial actual damages." See ante at 7 (quoting jury instructions). The

17

officers do not offer any objection to the jury instructions, nor could they since the instructions are clearly proper. Thus, a properly instructed jury awarded Jackson one dollar in nominal damages and $9,500 in punitive damages. Even the majority acknowledges that this award reflects the jury's clear finding that Jackson had suffered more than de minimis injury. See ante at 7.

In rejecting this finding, the majority relies on the distinctions between this case and Williams v. Benjamin, 77 F.3d 756 (4th Cir. 1996). See ante at 7-9. The majority contends that Jackson did not suffer more than de minimis injury in the form of an impermissible infliction of pain because (i) pepper spray is a milder irritant than the tear gas used in Williams, (ii) exposure to pepper spray does not necessitate medical treatment as does tear gas, nor does it have any permanent effect and (iii) the four-point restraints used in Williams were more restrictive than the three-point restraints used here. See ante at 7-9.

Cases seldom present identical facts, and the facts in this case obviously are not identical to those in Williams; however, I believe that in significant respects the facts here evidence a more, not less, egregious infliction of unnecessary pain. Although pepper spray may be a milder irritant than tear gas, Vincent Nathan, Jackson's expert, testified that exposure to pepper spray causes painful burning in the eyes, nose, and throat, swelling, skin irritation and coughing or gagging, as well as psychological trauma, including fear, disorientation, anxiety and panic. Jackson's testimony confirmed that he experienced all of these effects, and that he was not properly decontaminated after his exposure to pepper spray -- a fact which MCAC's own regulations confirm. Moreover, while Jackson was bound in three-point restraints, as opposed to the four-point type used on Williams, Jackson was confined in the painfully tight restraints and prevented from using his hands to feed himself or assist in urination for forty-four hours -- almost six times as long as Williams's confinement. **3**

_____

**3** The majority concludes that the three-point restraints could not have totally prevented Jackson from using his hands because he was wearing three-point restraints when he used his hands to flush his face and groin with water in the infirmary. See ante at 9. However, between Jackson's

18

Even if this were not a stronger case than <u>Williams</u>, the evidence summarized above undoubtedly constitutes ample proof of an imposition of pain sufficient to support the jury's verdict. Despite the majority's efforts to recast the evidence, a reasonable jury could certainly have found that the evidence offered of forty-four hours of pain and inhumane treatment demonstrated "an impermissible infliction of pain" resulting in greater than de minimis injury. <u>Norman</u>, 25 F.3d at 1263 n.4.

Moreover, even if I agreed with the majority's conclusion that Jackson's prolonged confinement in the Pink Room did not cause him to suffer an impermissible amount of pain constituting more than de minimis injury, we would nonetheless be obligated to sustain the jury's verdict because the record reveals abundant evidence that the force used on Jackson was of the sort "repugnant to the conscience of mankind." <u>Id.</u> Where the amount of force used rises to this level, a claimant need not show even de minimis injury to satisfy the objective element of an excessive force claim. <u>See id.</u>

In the instant case, the jury not only found for Jackson on his excessive force claim arising from his confinement in the Pink Room, it also took the "extraordinary measure" of requesting that a statement be read into the record expressing its disapproval of the guards' treatment of Jackson. In this statement, the jury stated unequivocally that it "regard[ed] the conditions inflicted upon the prisoners [in the Pink Room] of a sort repugnant to the conscience of mankind." Although the majority dismisses the jurors' statement as "gratuitous," <u>ante</u> at 7, surely these words, in conjunction with the jurors' modest damages award, signal that they carefully assessed the evidence presented and

_____

visit to the infirmary and his confinement in the Pink Room, Jackson's shackles were removed to permit him to change his underwear and he was then re-shackled before being placed in the Pink Room. Thus, the fact that he could move his hands while in the infirmary does not mean that he could move them equally well when confined in the Pink Room because the shackles could have been placed on Jackson more tightly the second time. In any event, we are required to credit Jackson's testimony that, during his time in isolation confinement, he could not move his hands to remove his underwear or to eat.

19

concluded, as they expressly stated, that the guards acted in a manner "repugnant to the conscience of mankind." I fear that, in its dismissal of the jury's words, the majority forgets that it is juries, and not courts, who are charged with expressing the conscience of the community. See Jones v. United States, 527 U.S. 373, 382 (1999) ("[I]n a capital sentencing proceeding, the Government has`a strong interest in having the jury express the conscience of the community on the ultimate question of life or death.'") (quoting Lowenfield v. Phelps, 484 U.S. 231, 238 (1988)); see also BMW of North America, Inc. v. Gore, 517 U.S. 559, 600 (1996) (Scalia, J. dissenting) ("[P]unitive damages represent the assessment by the jury, as the voice of the community, of the measure of punishment the defendant deserved.").

In sum, Jackson offered more than sufficient evidence to satisfy the objective component of his excessive force claim.

V.

The evidence is equally clear that Jackson satisfied the subjective component, i.e., he offered abundant evidence that the correctional officers applied force "maliciously and sadistically for the very purpose of causing harm." Whitley, 473 U.S. at 320-21.

In determining whether prison officials have acted "maliciously and sadistically" a court should balance: (i) the need for the application of force, (ii) the relationship between that need and the amount of force used, (iii) the threat reasonably perceived by the responsible officials, and (iv) any efforts made to temper the severity of a forceful response. See Hudson, 503 U.S. at 7 (citing Whitley, 475 U.S. at 321-22). The absence of serious injury is also a relevant, but not dispositive, factor to be considered in the subjective analysis. Id.

With respect to the first Whitley factor, the need to use force, the jury unquestionably could have concluded that the officers did not need to confine Jackson to the Pink Room in unduly tight three-point restraints, without clothing, bedding, a toilet or even the opportunity to properly clean off the pepper spray, for nearly two days. No doubt, in certain situations, pepper spray, isolation confinement, and three-point restraints can serve valid penological purposes. But the officers

20

have not even offered a justification for the prolonged use of all three of these tools in this case, or for the manner in which they were used.

The record evidence reveals that when the Response Team arrived at Jackson's cell, he was calm; any disturbance caused by Jackson's earlier disruptive behavior had clearly ceased. Even if Jackson initially disobeyed orders to submit to a search (and we are bound to credit Jackson's testimony that he did not), it is undisputed that Jackson complied with these orders as quickly as he could after being sprayed, given the disorienting effects of the pepper spray. By the time Jackson was placed in the Pink Room, he was not a danger to himself or the officers. He did not possess any weapons or contraband -- the officers knew this because Jackson had just submitted to two body searches -- and he was rendered helpless by the pepper spray. Given this, a reasonable jury could easily have found that extended isolation confinement without the opportunity to wash off the pepper spray was unnecessary. But, even assuming that it was necessary to transfer Jackson to the Pink Room, the officers have offered no justification for the prolonged use of the painfully tight restraints. Thus, a reasonable jury could certainly have concluded that the prolonged use of in-cell shackles were unnecessary.

The second Whitley factor, the relationship between the need for the force and the amount of force used, is closely related to the first factor. As stated above, while Jackson's intransigence might have justified the use of some force, the evidence supports a finding that the amount of force used in this case was grossly disproportionate to the need. By the time the Response Team arrived at Jackson's cell, he was calm and had ceased to cause a disturbance. Nonetheless, the officers sprayed him with twelve bursts of pepper spray. After that, Jackson was nearly helpless and complied with all of the officers' orders. Nonetheless, the officers painfully restrained him and placed him in the Pink Room for an extended period of time, without clothing or an opportunity to wash off the pepper spray. Given that the Pink Room is designed to allow an inmate creating a disturbance an opportunity to "cool off," and Jackson was calm for the first seventeen hours of his forty-four hour confinement, there was no justification for keeping Jackson in the Pink Room for such an extended period.

21

With respect to the third Whitley factor, the jury certainly could have found that the officers did not "reasonably perceive" that Jackson posed any threat to their safety that would require them to use this amount of force. As stated above, at the time of the incident, the officers knew that Jackson did not possess any contraband, or anything that could be used as a weapon, because they had just subjected him to a cell and body search. Even if the officers needed to place Jackson in restraints while transporting him to the Pink Room for a limited cooling-off period, there was no evidence of any threat justifying the officers' excessive response. In fact, the prison's own policy states that in-cell restraints are only to be used when an inmate poses a threat to himself or others, and the officers offered no evidence that Jackson posed any such danger here.

As to the fourth Whitley factor -- the officers' effort to temper the severity of their response -- it appears that no such effort was made in this case. The officers persisted in using force against Jackson -- including Officer Fenton's unwarranted blow to Jackson's head -- even after he was incapacitated by the pepper spray and had complied with all orders. Moreover, even though Jackson was calm during his confinement in the Pink Room, the officers kept him there, in restraints, for nearly two days. Both of these facts indicate that the officers failed to temper their response to accord with the situation.

In short, reviewing the evidence, as we must, with the appropriate deference to the jury's factual findings, each of the four Whitley factors weighs in favor of Jackson.[4] Given the officers' unjustifiable use of force and excessively punitive measures, it was certainly reasonable for the jury to conclude that they acted both maliciously and sadistically in confining Jackson to the Pink Room in these conditions for a period of nearly two days.

_____

[4] Although it is true, as the majority notes, that courts should afford deference to prison officials, see ante at 5, particularly where the initial application of force is a "good faith effort to maintain discipline," it is equally true that courts must not allow such deference to "insulate from review actions taken in bad faith for no legitimate purpose." Whitley, 475 U.S. at 322. Where, as here, prison officials' actions lack a legitimate purpose, it is reasonable to infer, that those actions constitute wanton punishment.

22

VI.

For the reasons set forth above, I believe that there was a "legally sufficient evidentiary basis for a reasonable jury" to decide that the officers' actions constituted excessive force in violation of the Eighth Amendment. Fed. R. Civ. P. 50(a)(1); Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 149-50 (2000). Accordingly, I respectfully dissent from the majority's holding to the contrary. **5**

_____

**5** The officers assert that even if they used excessive force in confining Jackson to the Pink Room, they are entitled to qualified immunity because, at that time, it was not clearly established that the level of force used in this case was excessive. "[G]overnment officials performing discretionary functions generally are granted a qualified immunity and are `shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Wilson v. Layne, 526 U.S. 603, 609 (1999). "Clearly established for the purposes of qualified immunity means that the `contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" Id. at 614-15. At the time of the events at issue in this case, it was "clearly established" that the wanton infliction of pain on an inmate without penological justification constitutes cruel and unusual punishment. See Whitley, 475 U.S. at 319 ("[T]he unnecessary and wanton infliction of pain constitutes cruel and unusual punishment forbidden by the Eighth Amendment . . . ."). Abundant and virtually uncontroverted evidence demonstrated that, after failing to decontaminate Jackson properly from the effects of the pepper spray, the officers confined him to the Pink Room for a period of two days -- shackled the entire time in painful three-point restraints -- and that they took these actions even though Jackson posed no danger to himself or others and was calm for the first seventeen hours of his confinement. In doing so, the officers "unnecessar[ily] and wanton[ly] inflict[ed] . . . pain," an act which the Supreme Court held more than a dozen years ago is "forbidden by the Eighth Amendment." Id. Qualified immunity offers no escape for those who engage in such conduct.

23